IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC. | ) | |
| 1000 Urban Center Drive, Suite 300 | ) | |
| Birmingham, AL  35242, | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 9:14-mc-81189-DMM |
| | ) | (Case No. 2:11-cv-3695-RDP-TMP |
| | ) | pending in the U.S. District Court for |
| TERRENCE P. COLLINGSWORTH, | ) | the Northern District of Alabama, |
| individually and as agent of Conrad & | ) | Southern Division) |
| Scherer, LLP, | ) | |
| 1156 15th Street, NW, Suite 502 | ) | |
| Washington, D.C.  20005; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CONRAD & SCHERER, LLP, | ) | |
| 633 S. Federal Hwy. | ) | |
| Fort Lauderdale, FL  33301, | ) | |
| | ) | |
|     Defendants. | ) | |

**DRUMMOND COMPANY, INC.'S RESPONSE IN OPPOSITION TO
NON-PARTY JACK SCAROLA AND SEARCY DENNEY SCAROLA BARNHART &
SHIPLEY, P.A.'S MOTION TO QUASH SUBPOENAS DUCES TECUM, FOR
PROTECTIVE ORDER AND FOR SANCTIONS**

H. Thomas Wells, III
ASB-4318-H62W
twells@starneslaw.com
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL 35259
(205) 868-6000
Fax:  (205) 868-6099

Brett Alan Barfield
Florida Bar No. 192252
brett.barfield@hklaw.com
HOLLAND & KNIGHT
701 Brickell Avenue, Suite 3300
Miami, FL 33131
(305) 789-7661
Fax:  (305) 789-7799

*Attorneys for Drummond Company, Inc.*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................. ii

Introduction ............................................................................................................................... 1

Facts .......................................................................................................................................... 2

    I.      Background of Defamation Litigation ..................................................... 2

    II.     Related Alien Tort Statute Litigation ...................................................... 2

    III.    Alleged Basis for Mr. Collingsworth's Defamatory Letters .................................. 3

    IV.    Evidence that Defendants Paid Colombian Paramilitaries ..................................... 4

    V.     Drummond's Subpoenas to Mr. Scarola and His Firm ............................................ 7

Legal Argument ....................................................................................................................... 10

    I.      THE MOVANTS' DID NOT HONOR THEIR MEET AND CONFER OBLIGATIONS. ......... 10

    II.     DRUMMOND'S SUBPOENAS SEEK NON-PRIVILEGED DOCUMENTS PROPERLY WITHIN THE SCOPE OF DISCOVERY. ..................................................... 10

          A.     Documents relating to witness payments are not overbroad and are properly within the scope of discovery. ..................................................... 10

          B.     The documents sought by Drummond's subpoenas are not protected from disclosure by the work product doctrine. .......................... 12

    III.    DRUMMOND'S SUBPOENAS DO NOT IMPOSE AN UNDUE BURDEN ON THE MOVANTS. ...................................................................................................... 15

    IV.    THE MOVANTS' REQUESTS FOR SANCTIONS SHOULD BE DENIED. ......................... 17

Conclusion ............................................................................................................................... 18

Certificate of Service .............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Adelman v. Boy Scouts of Am.*,
    276 F.R.D. 681 (S.D. Fla. 2011) ...................................................................................15

*Bozeman v. Chartis Cas. Co.*,
    2:10-CV-102-FTM-36, 2010 WL 4386826 (M.D. Fla. Oct. 29, 2010) ..........................13

*Bridgewater v. Carnival Corp.*,
    286 F.R.D. 636 (S.D. Fla. 2011) ..............................................................................12, 13

*Centrix Fin. Liquidating Trust v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    4:12-MC-624-JAR, 2013 WL 3225802 (E.D. Mo. June 25, 2013) ..................................11

*Chevron Corp. v. Donziger*,
    No. 11-civ-0691(LAK), 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013) ...........................16

*E.E.O.C. v. Windmill Intern., Inc.*,
    No. 11–cv–454–SM, 2012 WL 3583436 (D.N.H. Aug. 20, 2012) ..................................17

*Fincher v. Keller Indus., Inc.*,
    129 F.R.D. 123 (M.D.N.C. 1990) ...................................................................................11

*Hickman v. Taylor*,
    329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ..........................................................13

*In re First Am. Corp.*,
    184 F.R.D. 234 (S.D.N.Y. 1998) ....................................................................................16

*In re Grand Jury Subpoenas*,
    902 F.2d 244 (4th Cir. 1990) ..........................................................................................15

*In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*,
    318 F.3d 379 (2d Cir. 2003)............................................................................................11

*In re Naranjo*,
    2014 WL 4723806 (4th Cir. Sept. 24, 2014) ..................................................................11

*Johnston v. Dillard Dept. Stores, Inc.*,
    152 F.R.D. 89 (E.D. La. 1993)........................................................................................14

*JTR Enterprises, LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts &
Quartz Crystals*,
    297 F.R.D. 522 (S.D. Fla. 2013) .....................................................................................14

*Klima v. Carnival Corp.*,
    No. 08-20335-CIV, 2009 WL 1066969 (S.D. Fla. Apr. 29, 2009).....................................10

*Minebea Co. v. Papst*,
    228 F.R.D. 13 (D.D.C. 2005).................................................................................................15

*QBE Ins. Corp. v. Jorda Enterprises, Inc.*,
    286 F.R.D. 661 (S.D. Fla. 2012).............................................................................................14

*Sec. & Exch. Comm'n v. Dresser Indus., Inc.*,
    453 F. Supp. 573 (D.D.C. 1978) *aff'd*, 628 F.2d 1368 (D.C. Cir. 1980).............................15

*Stern v. O'Quinn*,
    253 F.R.D. 663 (S.D. Fla. 2008).............................................................................................14

*Tambourine Comercio Internacional SA v. Solowsky*,
    312 F. App'x 263 (11th Cir. 2009) ........................................................................................13

*United States v. Nobles*,
    422 U.S. 225 (1975).................................................................................................................14

## Statutes and Rules

Fed. R. Civ. P. 45(e)(2)(A) ..........................................................................................................12

Southern District of Florida Local Rule 7.1................................................................................10

Southern District of Florida Local Rule 26.1..............................................................................12

## Other Sources of Authority

8 C. Wright & Miller, *Federal Practice and Procedure* § 2024 (1970).......................................13

This miscellaneous proceeding arises from a subpoena issued in a defamation case filed by Drummond Company, Inc. ("Drummond") against Terrence P. Collingsworth and Conrad & Scherer LLP (the "Defendants") in the Northern District of Alabama. *Drummond Company. Inc. v. Collingsworth*, No. 2:11-cv-3695-RDP-TMP (N.D. Ala.).  Drummond is an Alabama-based coal company whose subsidiary operates a coal mine in Colombia, South America.  Mr. Collingsworth is an attorney who has filed numerous unsuccessful lawsuits against Drummond under the Alien Tort Statute ("ATS"), alleging that Drummond collaborated with an illegal group of paramilitaries in Colombia.  Mr. Jack Scarola and his firm, Searcy Denney Scarola Barnhart & Shipley, P.A., (collectively hereinafter the "Movants"), are co-counsel with the Defendants in a similar ATS case against Chiquita Brands International (the "*Chiquita* MDL litigation"), alleging Chiquita's collaboration with the same Colombian paramilitaries.

Between January and September 2011, Mr. Collingsworth sent a series of defamatory letters to Drummond's customers and business partners stating as "objective facts" that Drummond was complicit with Colombian paramilitaries in the commission of scores of murders in Colombia.  In defense of the resulting defamation suit, Mr. Collingsworth claims he relied upon the testimony of imprisoned Colombian paramilitaries for the truth of these scurrilous accusations.  But what is being discovered is Mr. Collingsworth provided illicit benefits, in a variety of ways, to these witnesses.  It is undisputed that Mr. Collingsworth paid more than $100,000 to multiple witnesses who testified against Drummond in the ATS cases.[1]  It is also undisputed that Mr. Collingsworth promised a substantial contingency fee in the ATS cases to the Colombian criminal attorney for several paramilitaries who subsequently provided favorable testimony to Mr. Collingsworth.  Wells Decl., ¶¶ 30 & 31.

As further set forth below, there is documentary proof that Mr. Collingsworth discussed the nature, extent and purported purpose of these payments with Mr. Scarola, as well as the propriety of paying paramilitary witnesses' criminal lawyers.  Drummond's subpoenas are directly targeted at discovering this and other evidence relating to payments to, or other improper influence of, Colombian paramilitary witnesses.  Discovery of this evidence will show Mr. Collingsworth either knew, or recklessly disregarded, that his letters were false because they

---

[1] Drummond has discovered hundreds of thousands of dollars of additional payments to individuals in Colombia and Panama that Defendants have yet to explain.  Declaration of H. Thomas Wells, III (Wells Decl.) ¶ 27.

were based on witness testimony that was unreliable at best, paid for at worst.  As explained on page 10 below, rather than engaging in a good faith meet and confer on the subpoena, the Movants filed a motion to quash the subpoena in its entirety and for sanctions.  Their motion is procedurally defective and substantively meritless.  It should be denied.

FACTS

**I.      Background of the Defamation Litigation**

Beginning in January 2011, Mr. Collingsworth sent and published three defamatory letters, two to the government of The Netherlands[2] and one to Itochu Corporation, a Drummond business partner.  The letters, written on Conrad & Scherer letterhead, stated, among other falsehoods, that "hundreds of Colombian citizens . . . had a family member murdered by paramilitary forces acting on behalf of Drummond."  Doc. 1-1 (First Am. Compl.) at ¶ 14(a).  One of the letters stated that "[l]ike many of the companies operating in Colombia during the civil conflict, Drummond joined forces with the AUC [Autodefensas Unidas de Colombia], a terrorist organization."  *Id*. at ¶ 27. The AUC is a paramilitary organization in Colombia that for several years was locked in a civil conflict with left-wing guerillas.  Drummond's coal mine operated in Colombia during this civil conflict.

In essence, Mr. Collingsworth told Drummond's customers and business partners that Drummond was a murderer that collaborated with a paramilitary terrorist organization, and urged the recipients of the letters to sever all business ties with Drummond.  Defendants do not deny that Mr. Collingsworth sent the letters. The primary issue in the defamation case is whether Defendants knew or recklessly disregarded that their defamatory letters were false.

**II.     Related Alien Tort Statute Litigation**

Mr. Collingsworth has filed four[3] separate lawsuits against Drummond under the ATS, beginning in 2002.  In those lawsuits, Mr. Collingsworth accused Drummond of aiding and abetting paramilitaries in killing Colombian citizens who either worked at Drummond's coal

---

[2] The Netherlands government influences or controls the coal Netherlands-based utilities purchase.

[3] The actual number is eight, but the first five cases were all consolidated under the case file *Romero v. Drummond Company, Inc.*, No. 7:03-cv-0575-KOB (N.D. Ala.).

mine or lived along the railroad that carries coal from its mine to port for shipment overseas.

None of Mr. Collingsworth's ATS cases against Drummond have met any success. In the first case, after certain claims and defendants were dismissed on summary judgment, a jury in 2007 conclusively found in favor of the remaining defendants on all claims. *Romero v. Drummond Company, Inc.*, No. 7:02-cv-0575-KOB (N.D. Ala.). In the second case, filed in 2009, the district court dismissed Mr. Collingsworth's claims against Drummond and its executives, and this dismissal was recently affirmed by the Eleventh Circuit. *Baloco v. Drummond Company, Inc.*, No. 12-15268, -- F.3d --, 2014 WL 4699481 (11th Cir. Sept. 23, 2014). The third case, also filed in 2009, resulted in a complete summary judgment in favor of Drummond and its executives. *Balcero v. Drummond Company, Inc.*, No. 2:09-cv-01041-RDP (N.D. Ala.) ("*Balcero* litigation").[4] The last case, filed in 2013, is awaiting a ruling on Drummond's motion to dismiss, and has been stayed pending the resolution of related appeals pending before the Eleventh Circuit. *Melo v. Drummond Company, Inc.*, No. 2:13-cv-00393-RDP (N.D. Ala.).

## III.   Alleged Basis for Mr. Collingsworth's Defamatory Letters

Defendants claim that they did not act with reckless disregard of the truth when they wrote the defamatory letters because they relied on "evidence" gathered during Mr. Collingsworth's serial litigation against Drummond. It is therefore crucial to the resolution of this motion for the Court to understand what "evidence" Mr. Collingsworth actually has from the multiple ATS cases he has filed against Drummond over the last twelve years. In those cases (primarily the *Balcero* litigation), Mr. Collingsworth has no documents showing that Drummond paid paramilitaries in Colombia. Mr. Collingsworth and his team deposed numerous current and former Drummond executives and employees. Every deponent unequivocally denied that Drummond collaborated with or paid paramilitaries and testified that Drummond had an absolute policy against doing so. Wells Decl., ¶ 5.[5]

The only "evidence" Mr. Collingsworth has is the testimony of imprisoned Colombian paramilitary members or collaborators. These witnesses claimed they had knowledge that

---

[4] *Balcero* is currently on appeal.

[5] Citations to numerically designated exhibits will be to those attached to the declaration of H. Thomas Wells, III filed contemporaneously herewith.

Drummond collaborated with paramilitaries.  This is the sole evidence purportedly supporting the "truth" of Defendants' defamatory letters, and whether Defendants have a reasonable belief in the truthfulness of those prisoners' testimony is at the heart of this case.

## IV.  Evidence that Defendants Paid Colombian Paramilitaries

*After* the close of discovery in the *Balcero* litigation, Mr. Collingsworth produced documents showing that he and his litigation team paid over $90,000 to four Colombian paramilitary witnesses or their families.  Mr. Collingsworth admits to making these payments, but now characterizes them as "funds for security" or "security funds."  Ex. 1 (Collingsworth Decl.) ¶¶ 34 & 35.[6]

Although Mr. Collingsworth claims these payments were for "security," he has not produced any documents to that effect, such as invoices from security companies to the witnesses showing the provision of protection services, contracts between the witnesses and any security company, or even emails with the witnesses outlining what protection will be provided. He also never disclosed to the Court in *Balcero* that he was making such "security" payments, nor did he seek guidance or approval from any Bar Association or other authority.  Moreover, there are no police reports or other complaints or requests to Colombian authorities regarding the need for "security" assistance.  The ***only*** evidence that these payments were for security are self-serving statements by Mr. Collingsworth.

Thus far, Drummond has uncovered evidence showing payments were made or offered to at least five paramilitaries totaling well over $100,000.  Four have provided testimony against Drummond in the ATS cases, while the other has been identified by Defendants as a potential

---

[6] While Defendants do not deny these payments *now*, they misrepresented their existence in *Balcero* even after the court ordered disclosure of any payments to paramilitaries.  That order, entered March 6, 2012, required Mr. Collingsworth to disclose "anything of value offered or given by Plaintiffs" to any witness identified in Rule 26 disclosures or any Colombian paramilitary. Ex. 2 (*Balcero* Doc. 332) at 6-7. Yet on May 16, 2012, Mr. Collingsworth signed a response to an interrogatory seeking this very information and stated that he had "provided Duarte with hamburgers and other food on several occasions…paid to relocate Plaintiff Claudia Balcero and her family…purchased lunch for witnesses during depositions…[and] arranged for a temporary safe house and…transportation[for Rafael Garcia]." Ex. 3 at No. 4.  As of the date Mr. Collingsworth signed this response, he had already paid approximately $50,000 to paramilitary "Halcon," at least $5,000 to paramilitary Libardo Duarte, $2,084 to paramilitary Jose del Carmen Gelvez Albarracin (alias "El Canoso"), and had been making monthly payments to paramilitary Jairo de Jesus Charris for nearly three years.  Exs. 4, 5, 12, 14, 15, 18, 19, & 27.

witness with relevant knowledge of Defendants' allegations against Drummond.

**Jairo de Jesus Charris Castro.**   First is Jairo de Jesus Charris Castro ("Charris"), who has been incarcerated in Colombia since 2008.   Charris provided a declaration in September 2009 in the *Balcero* litigation.   He also provided testimony in Colombia through the letter rogatory process, which was video-taped for use at trial.

*After* Charris provided his trial testimony in the *Balcero* litigation, and *after* the discovery period in *Balcero* had closed, Mr. Collingsworth produced documents showing that Mr. Collingsworth and his team had been paying Charris and his family a 1,500,000 peso monthly allowance since July 2009—two months prior to his signing a declaration for Mr. Collingsworth. Wells Decl., ¶ 7 and Ex. 4.   Based on documents produced to date by Defendants, the payments have continued from July 2009 through September 2013, totaling 74,681,950 pesos—which equals approximately \$39,162.01.   Ex. 5.

The payments to Charris have been facilitated by Ricardo Garzon and Yineth Baeza. Wells Decl. ¶¶ 9 & 10.   Garzon is a "field attorney" for Conrad & Scherer and International Rights Advocates ("IRA").[7]   Wells Decl. ¶ 11 and Ex. 6.   Baeza works with Francisco Ramirez who is a "collaborating attorney" for IRA, Wells Decl. ¶ 10 and Ex. 7, and is "local counsel" for Mr. Collingsworth. Ex. 1 (Collingsworth Decl.) ¶ 51. All but one of the payments were made directly to Charris' wife, Claudia Elena Pinzon. Wells Decl. ¶ 9; Ex. 4; Ex. 8 (Charris Dep. at 9:19-20).

The documents showing payments to Charris do not mention security but rather appear to be a "monthly allowance" for unspecified uses.   For example, in April 2010, Charris sent an email to Baeza requesting additional money.   Wells Decl. ¶ 12 and Ex. 9 (Charris email).   In the email, he states that his 82-year-old mother-in-law lives in Barranquilla, Colombia, that his wife's current landlord was evicting them, and that there was a possibility that he would be transferred to a prison in Barranquilla.   *Id.*   Charris requested that the "monthly allowance" be

---

[7] In addition to being a partner at Conrad & Scherer, Mr. Collingsworth is also the Executive Director and General Counsel of IRA. According to its website, IRA is an "entity focused on litigation against US corporations for human rights violations committed abroad, principally under the Alien Tort Statute (ATS)." Ex. 10. The IRA website lists four "collaborating attorneys" who work with IRA: Alfred Brownell, Paul Hoffman, Francisco Ramírez Cuellar and David Garces.   *Id.*   The IRA website also lists a current six-member "team": Terry Collingsworth, Christian Levesque, Eric Hager, Charity Ryerson, Lorraine Leete and Cassandra Webster. *Id.*

sent early and that Baeza's group pay for the costs of his family's move. *Id.* Baeza responded with a statement from Francisco Ramirez to Charris to the effect that if Charris transferred prisons, the costs of his family's move would be covered, that the 1,500,000 pesos per month would continue to be paid, and that an unspecified business proposal submitted by Charris' wife to Ramirez was rejected as excessive. Ex. 7.

*Libardo Duarte*. The second group of payments were to Libardo Duarte a/k/a "Bam Bam." Duarte is in prison for crimes he committed while a Colombian paramilitary. Duarte provided Mr. Collingsworth a declaration on February 27, 2011 in the *Balcero* litigation. It is currently unknown when the agreement was made for Duarte to receive payments, but on April 15, 2011, Duarte emailed Lorraine Leete, who works for IRA, providing her with the names and account information for Katerin Durango Avendaño and Leydi Johana Perez Valencia—people Mr. Collingsworth states are family members of Duarte. Wells Decl., ¶ 14 and Ex. 11; Ex. 1 (Collingsworth Decl.) ¶42.

On April 18, 2011, a wire transfer was made to Leydi Johana Perez Valencia from Conrad & Scherer in the amount of $2,500. Ex. 12. On April 20, 2011, Duarte emailed Leete complaining that the money had not arrived and saying, "I don't like this." Ex. 13. Duarte sent a series of additional emails that day inquiring as to the payments. *Id*. On April 29, 2011, a wire transfer was made to Katerin Durango Avendaño from the account of Conrad & Scherer in the amount of $2,500. Ex. 14. A heavily redacted bank statement from April 2011 for C & S's "Operating Account" reflects an additional $5,000 wire transfer to Avendaño on April 18, 2011. Ex. 15.[8] Accordingly, the documentary evidence discovered to date suggests Duarte was paid at least $10,000.

*"Halcon."* The third, and largest, group of payments were to an AUC member known only to Drummond as "Halcon." "Halcon" was identified by Mr. Collingsworth as a witness with relevant knowledge in the *Balcero* litigation. Wells Decl., ¶ 16 and Ex. 16. Defendants'

---

[8] Exhibits 15, 29 and 32 to this filing were the subject of Drummond's previous motion for leave to file under seal (Exhibit 32 was previously designated as Exhibit 34). After this Court denied the motion (DE 11), Drummond sought emergency relief from the Court in the Northern District of Alabama, and has been permitted to file these exhibits in redacted form. *See* Ex. 47 (Oct. 23, 2014 Report and Recommendation of Special Master); Ex. 48 (Oct. 23, 2014 Order). Therefore, Drummond files these exhibits in redacted form in an effort to comply with the Order of this Court as well as those of the Northern District of Alabama.

Rule 26 disclosures in this case incorporate all of the witnesses in the underlying ATS litigation, so he is a possible witness here as well.  Ex. 17.

Conrad & Scherer paid Halcon more than $50,000 from 2008 through October 15, 2012. Wells Decl. ¶¶ 20-22. The payments—approximately $1,250 per month—were effected by Conrad & Scherer employees taking cash to places in Ft. Lauderdale such as Publix, Wal-Mart and the Island Meat & Fish Supermarket to send international transfers via MoneyGram or Western Union to a person named Jose Pinzon. Wells Decl. ¶ 20 and Exs. 18 & 19.   Although Drummond does not know when the payments to Halcon began, Defendants produced emails from as early as April 2008 between Conrad & Scherer and Jose Pinzon discussing wire transfers for "our gentleman."  Ex. 20.  The payments are not described as "security" payments, but are characterized as "support" for Halcon and his family.  Exs. 21 & 22.

After MoneyGram raised questions about the payments, Pinzon wanted to misrepresent them as payments from family members.  Ex. 23.  In response, Mr. Collingsworth provided a letter stating the payments were for Pinzon to perform "fieldwork."  *Id.*  Mr. Collingsworth originally provided a sworn interrogatory response describing Pinzon as the "person [who] collects security payments on behalf of alias Halcon," Ex. 24 at No. 8, but then changed his story to state that Pinzon *is* Halcon.  Ex. 1 (Collingsworth Decl.) ¶ 41.  Recently, Mr. Collingsworth changed his story yet again, claiming he's been "confused" and that "Halcon's real name *may* be Luis Leon."  Ex. 25 (July 18, 2014 Collingsworth Decl.) ¶ 12.  Whatever his true identity may be, Halcon claims to be a former member of the AUC and an active participant in at least two murders. Ex. 26.   Drummond is currently seeking to discover what sort of "fieldwork" an admitted criminal and member of a terrorist organization was providing to Mr. Collingsworth.

*Jose Gelvez Albarracin*.   Defendants also paid Jose Gelvez Albarracin, a/k/a "El Canoso," who testified against Drummond in *Balcero*.  On November 28, 2011, a wire transfer was made from the Conrad & Scherer in the amount of $2,084 for the benefit of Celina Lombardi Nieves – El Canoso's wife.  Ex. 27 and Ex. 1 (Collingsworth Decl.) ¶ 44.

*Isnardo Ropero*.  Mr. Ropero testified against Drummond in *Romero v. Drummond Co., Inc.*, 7:03-cv-00575-KOB (N.D. Ala.).   Documents produced by Western Union and MoneyGram reflect that Defendants paid Ropero nearly $9,000 between July 18, 2007 and February 25, 2008.  Wells Decl. ¶ 28.  The first three payments to Ropero were sent by Daniel Kovalik, Mr. Collingsworth's co-counsel in *Romero*.  The first payment—for $1,890—was sent

on July 16, 2007, nearly a month after Mr. Ropero's trial deposition was taken in Panama.

## V.    Drummond's Subpoenas to Mr. Scarola and His Firm.

There is no question that Movants possess documents and email communications directly relevant to the extent and purpose of Mr. Collingsworth's witness payments.  For example, Mr. Paul Wolf – one of Messrs. Collingsworth and Scarola's co-counsel in the *Chiquita* MDL litigation – testified that Mr. Scarola was present at multiple meetings in which witness payments were discussed.  Ex. 28 (Wolf Decl.).  With respect to one such meeting in June 2011, Mr. Wolf testified as follows:

> Q. All right. And was there any discussion about whether or not Mr. Collingsworth was paying witnesses?
> MR. SMITH: Object to the form.
> Q. (BY MR. DAVIS) -- by Mr. Scarola?
> A [MR. WOLF]: Yes. I contacted Mr. Scarola by email several times and have produced those in discovery to you. That -- I wanted that to be an agenda item. So Scarola put that on the agenda. And as we went through the meeting, one of the agenda items which Mr. Scarola read was concern has been expressed about Conrad & Scherer's policy of paying witnesses in various cases.  And the group would like to discuss payments to witnesses in this case.
>
> That was essentially my concern, was that whatever was going on in the Drummond case was not going to be repeated in the Chiquita case. So Mr. Scarola asked him kind of a prepared question like that. I can't really repeat word for word what anyone said, what Terry said -- I said something. . . .  But the gist of it was that Terry was confronted with this accusation that his law firm has been paying witnesses. And his response was, "It's okay. Yes, we're paying witnesses, but it's justified and we have an ethics opinion based on that."  Now, I can't say that, yes, Terry said, "Yes, we are paying witnesses." I -- I maybe should correct what I just said on the record. I just don't remember exactly how Terry said it, but he didn't deny it. He justified paying witnesses.

Ex. 29 (Wolf Dep.) at 40:11-41:18.[9]

In an email exchange dated July 5, 2011, Mr. Scarola wrote:  "Bill and Terry – You agreed at our meeting to provide us with a copy of the ethics opinion you received regarding compensation to witnesses and members of their families as well as details of the expenses incurred to date that have directly or indirectly benefited potential witnesses.  This is a follow up reminder."  Ex. 28 (Wolf Decl.).  Mr. Collingsworth responded:  "Jack, we are working on this –

---

[9] Mr. Scarola does not dispute that he was present at this meeting. Ex. 31 (Scarola Decl.) at ¶ 3.  Nor does he dispute that Mr. Collingsworth's witness payments were discussed.  *Id.*

converting informal memo and oral advice to a memo for the group." *Id.*

On July 19, 2011, Mr. Collingsworth circulated via email a memo authored by an associate at Conrad & Scherer, LLP which analyzed the propriety of paying for witnesses' legal fees – but had nothing to do with payments for witness "security." Ex. 32 (July 19, 2011 email attaching Piper Hendricks Memo). In that email, Mr. Collingsworth openly advocated for payments to witnesses' lawyers, stating "Clearly can do; question is doing so in a way to minimize impact on credibility." *Id.* Presumably anticipating resistance to the idea of paying paramilitaries' criminal lawyers, Mr. Collingsworth stated: "For those reluctant, tell me how else we get truthful evidence of an AUC-Chiquita discussion." *Id.*

However, Mr. Scarola has testified that Mr. Collingsworth discussed with him paying *security* costs for witnesses and provided him a different memo addressing "witness security." Ex. 31 (Scarola Decl.) at ¶¶ 3-4. No such memo has ever been produced or logged by the Defendants.

The Movants' self portrayal as disinterested third parties being improperly "harassed" by Drummond is a mischaracterization of their status in this case. Indeed, in addition to their above described involvement in discussions regarding witness payments, Mr. Scarola interjected himself into this case when he submitted a sworn declaration nearly a year ago in support of Defendants' unsuccessful opposition to Drummond's motion to compel, testifying

> 3. […] Mr. Collingworth told the [*Chiquita* MDL] group that in his *Drummond* litigation, several witnesses and their family members received death threats when they were about to testify about Drummond's participation in war crimes and extrajudicial killings…he did say that in the Drummond case he was forced to relocate family members of witnesses because of credible death threats they received, and that we should be prepared to address this.
>
> 4. Mr. Collingsworth did provide the [*Chiquita* MDL] group a confidential legal memo addressing witness security and other issues that referenced the applicable legal and ethical standards.

*Id.* at ¶¶ 3 & 4.

The Movants cannot now complain that Drummond seeks documents relating to the substance of Mr. Scarola's testimony and which are critically relevant to this case—namely, the extent and purpose of Mr. Collingsworth's payments to witnesses and his subjective belief in the truth of their testimony. Drummond's subpoenas contain 10 specific requests which are narrowly focused on subjects which have already been held to be within the scope of discovery

9

by Judge R. David Proctor, who is presiding over Drummond's underlying defamation case against the Defendants.  Ex. 33.  A summary of the requests is below for the Court's reference:

| Request Nos. 1-8 | Documents related to payments to third party witnesses or their family members |
|---|---|
| Request No. 9 | Communications with the Defendants regarding the defamation case or this subpoena |
| Request No. 10 | Communications with Llanos Oil[10] |

## LEGAL ARGUMENT

### I.   THE MOVANTS' DID NOT HONOR THEIR MEET AND CONFER OBLIGATIONS.

Local Rule 7.1 governs pre-trial motion practice.  In pertinent part, subsection (a)(3) of Local Rule 7.1 provides that counsel for a movant must confer "with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion."  Drummond served the subpoenas on September 5, 2014.  A few days later, Drummond's counsel spoke briefly with Mr. Scarola, at which time Mr. Scarola raised no issues concerning burden or the time for compliance with the subpoenas.  Wells Decl. ¶ 3.  Mr. Scarola simply stated that Movants would be objecting based on privilege, but they had not yet made a decision on whether they would serve written objections to the subpoenas or file a motion to quash.  *Id.*  On September 19, 2014, the Movants filed a motion to quash.  They did not attempt to conduct *any* meet and confer, much less conduct the "good faith" meet and confer required by Local Rule 7.1.  As such, their motion should be denied.  *Klima v. Carnival Corp.*, No. 08-20335-CIV, 2009 WL 1066969, at *2-3 (S.D. Fla. Apr. 29, 2009) (denying a motion to quash due to a failure to comply with Local Rule 7.1(a)(3)).

### II.   DRUMMOND'S SUBPOENAS SEEK NON-PRIVILEGED DOCUMENTS PROPERLY WITHIN THE SCOPE OF DISCOVERY.

#### A.   Documents relating to witness payments are not overbroad and are properly within the scope of discovery.

---

[10] Llanos Oil is a Netherlands-based company antagonistic to Drummond which was intimately involved in creating Mr. Collingsworth's defamatory letters as part of a joint campaign to "clos[e] down Drummond."  DE 1-1 (First Am. Compl.) at ¶¶ 7-29.  Movants have provided no explanation whatsoever as to how documents pertaining to Llanos Oil could possibly be privileged or otherwise objectionable.

Request Nos. 1-8 of Drummond's subpoena, which seek communications with specified persons or entities regarding witness payments, are narrowly tailored and intended to uncover evidence already held to be properly within the scope of discovery by Judge Proctor:

> Interrogatories and requests for production on **payments to witnesses** are not overbroad and are properly within the scope of discovery. The fact of payments to witnesses are not subject to work product objections. Interrogatories and requests for production on **research regarding payments to witnesses** are not overbroad and are properly within the scope of discovery.  For any documents (payments to witnesses or research regarding payments to witnesses) withheld on grounds of attorney client privilege or work product, the Magistrate Judge will examine the privilege log and related documents and will make independent findings for each issue remaining in dispute.

Ex. 33 at 3-4.  This Court need look no further to determine that the subpoenas at issue are neither overbroad nor seek irrelevant material.  *Fincher v. Keller Indus., Inc.*, 129 F.R.D. 123, 125 (M.D.N.C. 1990) ("Even though this Court is the proper one to rule on plaintiffs' motion, it nevertheless will look at the status of the proceedings in the district where the action is pending and at relevant rulings issued by that court.").[11]

Judicial comity, which "instructs federal judges to avoid 'stepping on each other's toes when parallel suits are pending in different courts,'" also compels the conclusion that this Court should look to Northern District of Alabama's rulings with respect to the proper scope of discovery, privilege, and *in camera* review.  *In re Naranjo*, 2014 WL 4723806, at *11 (4th Cir. Sept. 24, 2014) (citation omitted).  "By applying comity in these and similar circumstances, courts achieve at least two positive results: avoiding 'an unnecessary burden on the federal judiciary' and preventing 'the embarrassment of conflicting judgments.'"  *Id.* (adopting and affirming the Southern District of New York's holding with respect to privilege and requiring a third party subpoena recipient to produce responsive documents).[12]

---

[11] *See also Centrix Fin. Liquidating Trust v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 4:12-MC-624-JAR, 2013 WL 3225802, at *5 (E.D. Mo. June 25, 2013) ("Given that the Colorado court is closest to the facts of the pending adversary proceeding filed by Plaintiffs, this Court will defer to its determination of the relevance and propriety of the discovery sought in ruling on the instant motions.").

[12] For the reasons set forth *infra* in Section II-B, none of the requested documents are privileged.  Nevertheless, to the extent the Movants withhold production of responsive documents on a claim of privilege, Drummond respectfully submits that judicial comity also

**B.      The documents sought by Drummond's subpoenas are not protected from disclosure by the work product doctrine.**

The Movants claim that the subpoenas would require disclosure of information and documents protected as attorney work-product and/or the "common interest and confidentiality agreement."  Doc. 1 at 3-4.  As an initial matter, the Movants did not preserve any privilege objections because they did not produce a privilege log.  Local Rule 26.1(g)(3)(B)(ii)(a) requires that they provide specific information to properly claim privilege, including "(1) the type of document…; (2) general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; and (4) such other information as is sufficient to identify the document."   Local Rule 26.1(g)(3)(C) correspondingly requires preparation of a privilege log with respect to all documents withheld on the basis of a claim of privilege or work product.  *See also* Fed. R. Civ. P. 45(e)(2)(A).  Neither Mr. Scarola nor his firm produced a privilege log, and thus their argument that Drummond's subpoenas seek privileged documents must be rejected.  *See Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011) (the burden borne by the party seeking to establish privilege is a heavy one, and "[a]n improperly asserted claim of privilege is no privilege at all.") (citations omitted).

The lack of a privilege log is no small matter.  Documents have been hidden during discovery in this case.  In fact, Drummond's subpoena to another law firm, Parker Waichman, LLP, resulted in the production of incriminating documents that had not only never been placed on a privilege log by Defendants, but Defendants affirmatively represented the documents did not exist.  *See* DE 101, *Drummond v. Collingsworth*, No. 2011-cv-3695-RDP (N.D. Ala.).  During a recent hearing on Defendants' attempt to claw back these documents on a claim they were "mistakenly" produced, the Court's concern over this issue was made clear:

---

justifies an *in camera* review of those documents to determine the viability of any privilege claim.  *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386-87 (2d Cir. 2003) (collecting cases and holding that *in camera* review is "a practice both long-standing and routine in cases involving privilege").  A Special Master has been appointed to handle all discovery disputes in the underlying defamation case, and his responsibilities include the *in camera* review of Defendants' purportedly privileged documents.  Ex. 34.  Allowing the Special Master (who is intimately familiar with the facts of the case and the Northern District of Alabama's prior discovery rulings) to conduct an *in camera* review of any documents withheld by the Movants will be the most efficient way to adjudicate any claim of privilege.

> THE SPECIAL MASTER   . . . It does not look good from the defendants' standpoint from where I sit in reading this that these [Parker Waichman emails] were not somehow logged or at least shown to exist because what you end up seeing, what the Court ends up seeing here is but for what appears to be a claim for a mistake, nobody would know that they exist. . . .
>
> [I]t does seem that but for a mistake that leads us to a clawback position, nobody would know that these exist, and that's a concern that the Court has raised to me and that I am raising to you all.

Ex. 30 (Oct. 9, 2014 Hrg. Tr.) at 24:3 – 25:5 and 26:9-14.

Aside from Movants' failure to preserve privilege through a privilege log, their privilege assertions also fail on the merits. First, to the extent that any of the requested documents reflect payments to any witness, they are not privileged. Ex. 33 at 3 ("The fact of payments to witnesses are not subject to work product objections."). The Movants cannot credibly argue otherwise.

Second, none of the requested material is privileged under the work product doctrine, which is intended to protect an attorney's thought processes *from an adversary*:

> The work product doctrine was created to allow attorneys to make careful and thoughtful preparation for litigation, without fear that their adversaries will unfairly benefit from their efforts. First recognized by the Supreme Court in *Hickman v. Taylor,* the doctrine is codified in Federal Rule of Civil Procedure 26(b)(3). It offers qualified protection for materials that are: (1) a document or a tangible thing, (2) prepared in anticipation of litigation, and (3) by or for a party, or for his representatives.

*Bridgewater*, 286 F.R.D. at 639 (citations omitted). The documents sought from the Movants were prepared for *different parties* in a *different case* in which Drummond is not involved. Put differently, Mr. Scarola's clients sued Chiquita, not Drummond, and the documents at issue were created during the course of representing of those clients in their claims against Chiquita.[13] In the Eleventh Circuit, those communications are not afforded work product protection in *this case*: "[d]ocuments prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit." *Tambourine Comercio*

---

[13] Significantly, absent review by the Supreme Court, the *Chiquita* case is now over. The Eleventh Circuit affirmed the dismissal of the case on July 24, 2014, *Cardona v. Chiquita Brands Intern., Inc.*, 760 F.3d 1185 (11th Cir. 2014), and denied the plaintiffs' petition for rehearing on October 2. Ex. 35 (11th Cir. Order Denying Pet. for Reh'g and Reh'g En Banc).

*Internacional SA v. Solowsky*, 312 F. App'x 263, 284 (11th Cir. 2009) (quoting 8 C. Wright & Miller, *Federal Practice and Procedure* § 2024, at 201 (1970)); *see also Bozeman v. Chartis Cas. Co.*, 2:10-CV-102-FTM-36, 2010 WL 4386826, at *2 (M.D. Fla. Oct. 29, 2010) ("A non-party is not entitled to claim work product protection.").  The documents Drummond seeks – which were created in the course of representing persons who are not parties to this or any litigation adverse to Drummond – are not protected as work product.[14]

Third, to the extent Wolf viewed any responsive communications or documents, no work product protection attaches.  Mr. Scarola testified that Wolf "refused to sign the confidentiality agreement, and…declined to accept other grounds rules the [*Chiquita*] group had agreed to in order to cooperate."  Ex. 31 at ¶ 2.  Yet, Mr. Scarola apparently continued to include Wolf in meetings and communications he claims were privileged.  *Id.* at ¶ 3.  As such, Movants waived work product protection over those documents. *Stern v. O'Quinn*, 253 F.R.D. 663, 683 (S.D. Fla. 2008) (work product waived where "disclosures were neither involuntary nor compelled").

Finally, the Movants waived any work-product protection through their selective disclosure in this case.  Ex. 31.  As this Court has explained,

> We are told that we cannot have our cake and eat it too. What this means in the privilege context is that a litigant cannot at one and the same time place privileged matters into issue and also assert that what has been placed into issue nonetheless remains privileged and not subject to full discovery and exploration.

*QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 286 F.R.D. 661, 664 (S.D. Fla. 2012) (citation omitted).[15]  Here, the Movants placed purportedly privileged matters at issue by testifying to the

---

[14] That being said, Drummond has no interest in interfering with the adversary process between Chiquita and Movants' clients.  Drummond is ready and willing to meet and confer with the Movants to craft a protective order that will prevent responsive documents from being publicly disseminated or disclosed to Chiquita.

[15] *See also United States v. Nobles*, 422 U.S. 225, 239-40 (1975) ("[W]here, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents…Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination."); *JTR Enterprises, LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts & Quartz Crystals*, 297 F.R.D. 522, 530-31 (S.D. Fla. 2013) (holding that an alleged work-product document that was referred to in a public statement could not be protected because a "party can't selectively cho[o]se which portions of a document to release to

substance of those conversations and documents.  Ex. 31 at ¶¶ 3-5.  Movants are now properly "subject to full discovery and exploration" on the same.  *Id.*  For all of these reasons, the documents Drummond seeks are not protected by the work product doctrine.[16]

### III. DRUMMOND'S SUBPOENAS DO NOT IMPOSE AN UNDUE BURDEN ON THE MOVANTS.[17]

As explained above, the Movants did not even attempt to meet and confer with Drummond regarding any alleged burden.  That omission is not a meaningless one – a meet and confer could have addressed many of the Movants' concerns.  For example, the Hopkins affidavit erroneously states that "category 2 of the subpoena seeks all communications that Searcy Denney had '*with any employee, agent or shareholder of Parker Waichman, LLP.*'"  Doc. 1-4 at ¶ 17.  Movants similarly (and incorrectly) contend that Drummond seeks "all communications, including emails that Searcy Denney had with 'Terrence P. Collingsworth *or any employee of Conrad & Scherer, LLP.*'"  Doc. 1 at 8.  These contentions are simply wrong, as they omit the language limiting such requests to communications relating to "(a) the provision of security in Colombia or (b) payments to witnesses or any Colombian paramilitary."  Doc. 1-2 at

---

the public and which portions it wishes to assert a privilege"); *Johnston v. Dillard Dept. Stores, Inc.*, 152 F.R.D. 89, 93-94 (E.D. La. 1993) (work product waived over notes of a meeting where litigant submitted an affidavit of counsel regarding what evidence was considered at the meeting).

[16] The Movants reference the "common interest" doctrine in both Mr. Scarola's affidavit, Ex. 31 at ¶ 3, and their motion to quash.  Doc. 1 at 3.  The "common interest" doctrine is not a privilege – rather, the "common interest rule presupposes the existence of an otherwise valid privilege."  *Minebea Co. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005) (quoting *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)).  As explained above, the Movants failed to establish that any of the requested documents are protected by the work-product doctrine, and thus their reliance on the "common interest" doctrine is inapposite.  The Movants also claim that the documents are "confidential." Doc. 1 at 3.  But it is well established that merely labeling a communication or document "confidential" does not shield it from disclosure.  *Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681, 692 (S.D. Fla. 2011) ("purportedly 'confidential' documents are not immune from discovery").  Moreover, as explained above in footnote 14, Drummond is willing to agree to a protective order that will prevent documents from being disseminated or disclosed to Chiquita or the public in general.

[17] At this point, the Court need not consider claims of burden.  During a recent meet and confer, initiated by Drummond to address Movants' claims of burden, Movants explained that it was premature to discuss Drummond's proposals before the Court ruled on the threshold issue of privilege.  Wells Decl., ¶ 4.  Movants stated a meet and confer on burden could be conducted once the Court resolves the privilege issues.  *Id.*

Req. Nos 1-8.  *Sec. & Exch. Comm'n v. Dresser Indus., Inc.*, 453 F. Supp. 573, 577 (D.D.C. 1978) *aff'd*, 628 F.2d 1368 (D.C. Cir. 1980) (rejecting an undue burden objection where a subpoena recipient "cite[d] a phrase from the subpoena, taken out of context, and allege[d] that the phrase could be interpreted to require the production of voluminous materials," and holding that "[t]he scope of the subpoena is clear and Dresser's attempts to misinterpret the subpoena so as to make it appear unreasonable will be rejected").  If Movants truly have so many documents discussing paying witnesses in Colombia that it is burdensome for them to produce them, that is a "burden" they should be compelled to undertake.[18]

Furthermore, the Movants are "no ordinary, unrelated non-party witness[es]."  *Chevron Corp. v. Donziger*, No. 11-civ-0691(LAK), 2013 WL 1087236, at **32-33 (S.D.N.Y. Mar. 15, 2013) (denying a request for reimbursement of estimated costs "in the range of $1,060,000 and $1,290,000" where the subpoena recipient was "an alleged co-conspirator and some of its actions are at issue in this case").[19]  Indeed, they are co-counsel with Defendants in a similar case and had multiple communications with Mr. Collingsworth relating to his payments to witnesses in Colombia.  More importantly, Mr. Scarola interjected himself into this case. Ex. 31.  Movants should not now be heard to complain that Drummond seeks discovery that directly bears on the statements in Mr. Scarola's testimony and his communications regarding the Defendants' witness payments.  Under these circumstances, it is appropriate for the Movants to pay for the cost of complying with the subpoenas.[20]

---

[18]  In addition to misconstruing the breadth of the requests, the Hopkins affidavit submitted in support of the Movants' motion to quash claims that the subpoenas are overbroad because "of the categories of documents sought," and "the imprecise nature of the keywords suggested by the requests in the subpoena," and will yield "ill-defined search results." Doc. 1-4 ¶¶ 16 & 18.  While Drummond disputes that the subpoenas are "imprecise" or "ill-defined," Drummond is nevertheless ready and willing to meet and confer with the Movants to create a mutually agreeable list of search terms and narrow the email accounts to help focus the Movants' search for responsive documents.  Had the Movants honored their meet and confer obligations, Drummond could have made this clear.

[19]  *See also In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) ("Where a non-party was 'substantially involved' in the underlying transaction and could have anticipated that [the transaction would] reasonably spawn some litigation,' expenses should not be awarded.") (citation omitted).

[20]  To be clear, Drummond does not agree that the Movants' estimate of the cost of compliance is reasonable or accurate.  Indeed, that estimate is premised on erroneous

## IV.   THE MOVANTS' REQUESTS FOR SANCTIONS SHOULD BE DENIED.

The Movants' final contention is that Drummond should be sanctioned under Rule 45(d)(1) because "there is no relevance between discussions between plaintiffs' counsel in the Chiquita Litigation and the Alabama Litigation."  Doc. 1 at 10.  They also argue that Drummond is "harassing Scarola and Searcy Denney," claiming that "Drummond could easily seek the same documents from [the Defendants] in the Alabama litigation[.]"  *Id.* at 10-11.  Setting aside the fact that the Movants did not even attempt to meet and confer before moving for sanctions, neither of these assertions is accurate.

The documents are unquestionably relevant, and the Northern District of Alabama already held as much.  *See* pages 10-11, *supra*.  The Movants' "duplicative" objection similarly fails because Judge Proctor has already held that such objections are without merit in light of the documents Drummond has uncovered through subpoenas that were neither produced nor logged by the Defendants:

> JUDGE PROCTOR: All right. Third, **I have seen some references to duplication; this subpoena is duplicative of a request already sent. <u>There's no such thing as duplication of discovery in this case. Any source that may have a document is fair game</u>.** Understood?

> MR. SMITH [counsel for Defendants]: Yes, Your Honor.

> JUDGE PROCTOR: The reason being that there are questions about whether everything has been produced.  There's things that have been produced by the Parker firm pursuant to a subpoena that the plaintiffs claim were not produced by the defendants in their request for production that they received in response to that. So there may be emails that are produced by one but not another. There may be -- and I think the plaintiffs are entitled to see whether the emails are authentic in that they appear to be the same in terms of what's produced. So there's not going to be any duplication. We are to respond to those.

Ex. 45 (Apr. 21, 2014 Hrg. Tr.) at 8:4-20 (emphasis added).[21]  In fact, Mr. Scarola has testified

---

assumptions regarding both the breadth of Drummond's subpoenas and the type of documents that Drummond seeks.

[21] Even in the absence of this prior ruling, Drummond's subpoenas would not be impermissibly duplicative.  *E.E.O.C. v. Windmill Intern., Inc.*, No. 11–cv–454–SM, 2012 WL 3583436, at **3-4 (D.N.H. Aug. 20, 2012) ("In many cases, it is important to obtain what should be the same documents from two different sources because tell-tale differences may appear between them; and in many cases when a party obtains what should be the same set of

Defendants provided him a memo pertaining to witness payments that has neither been produced nor logged by the Defendants.  Ex. 31 at ¶ 4.  Simply put, sanctions are not appropriate here.

**Conclusion**

Drummond respectfully requests that the Movants' motion be denied and that they be ordered to produce responsive documents in their possession, custody or control.  To the extent Movants continue to withhold responsive documents on claims of privilege, Drummond requests the Court to order Movants to produce a privilege log and provide the documents for *in camera* inspection to the Special Master appointed by the Northern District of Alabama to oversee discovery in this matter.  Alternatively, Drummond requests such documents be provided to this Court for *in camera* inspection.

Respectfully submitted,

| | |
|---|---|
| *s/ H. Thomas Wells, III* | *s/ Brett Alan Barfield* |
| H. Thomas Wells, III | Brett Alan Barfield |
| ASB-4318-H62W | Florida Bar No. 192252 |
| twells@starneslaw.com | brett.barfield@hklaw.com |
| STARNES DAVIS FLORIE LLP | HOLLAND & KNIGHT LLP |
| P.O. Box 59812 | 701 Brickell Avenue, Suite 3300 |
| Birmingham, AL 35259 | Miami, FL 33131 |
| (205) 868-6000 | (305) 789-7661 |
| Fax:  (205) 868-6099 | Fax:  (305) 789-7799 |

*Attorneys for Drummond Company, Inc.*

---

documents from two different sources a critical fact in the litigation turns out to be that one set omitted a document that was in the other set.") (citations omitted).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **October 24, 2014**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jack Scarola, Esq.
William B. King, Esq.
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone:  (561) 686-6300
Fax:  (561) 383-9465

*s/ Brett Alan Barfield*
OF COUNSEL

19